**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES MARCUS LANGSTON,** | ) | |
| **Administrator of the Estate of Zack Langston,** | ) | **MDL No. 2492** |
| **DANAE YOUNG, as mother and next friend** | ) | |
| **for D.L., a minor, and all others similarly** | ) | |
| **situated,** | ) | |
| | ) | |
| | ) | **Master Docket No. 16 C 8727** |
| **Plaintiffs,** | ) | |
| | ) | **Original N.D. Ill. Docket No.** |
| **v.** | ) | **17 C 4978** |
| | ) | |
| **MID-AMERICA INTERCOLLEGIATE** | ) | |
| **ATHLETICS ASSOCIATION, a Missouri** | ) | |
| **nonprofit corporation, and NATIONAL** | ) | **Judge John Z. Lee** |
| **COLLEGIATE ATHLETIC ASSOCIATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Langston, who is the administrator of the Estate of Zack Langston, and Danae Young, who is the mother of D.L., Zack Langston's minor son, have filed this action on behalf of a putative class of student athletes, who played football for Pittsburg State University ("PSU") in Kansas. Langston has sued the National Collegiate Athletic Association ("NCAA") and the Mid-America Intercollegiate Athletics Association ("MIAA")—PSU's athletic conference since 1989—for negligence, breach of express and implied contract, and unjust enrichment.[1]

According to the complaint, while playing football for PSU from 2007 to 2010, Zack Langston experienced over one hundred concussions. Toward the end of his college football

---

[1] In response to the MIAA's motion to dismiss, Plaintiffs have withdrawn the claim against the MIAA for breach of express contract. *See* Pls.' Resp. MIAA's Mot. Dismiss at 19, ECF No. 35; Compl., Count 2, ECF No. 1.

career, Langston evidently experienced severe deterioration of his memory, psychological well-being, and behavior, which he attributes to the repeated concussions that he suffered while playing football. Langston alleges that the NCAA and the MIAA knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries, but recklessly exposed players to those risks without regard for their health and safety in order to protect the profits gained from college football.

The NCAA and the MIAA have moved to dismiss all or portions of the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons provided herein, the motions are denied.

## Factual Background[2]

### I.     Langston at PSU

Zack Langston played football at PSU from 2007 to 2010 as an outside linebacker. Compl. ¶ 73. During his freshman year, coaches conducted drills that required him and his teammates to run at each other and hit each other as hard as they could. *Id.* ¶ 74. Langston suffered repeated concussive and sub-concussive impacts during these drills. *Id.* But, according to Plaintiffs, the NCAA and the MIAA lacked adequate concussion management protocols and return-to-play guidelines to address and treat concussions sustained by student-athletes during practices and games. *Id.* ¶¶ 76–77.

As a result, when Langston suffered a heavy hit during practice, he was often told to just "shake it off" and continue practicing. And, when he suffered concussive and sub-concussive hits during games, he again was told to get back onto the field. *Id.* ¶¶ 75, 78. On each such occasion,

_____

[2]     On a motion to dismiss, the district court accepts all well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019).

the NCAA and the MIAA withheld from Langston the medical attention and treatment that they knew was necessary to monitor, manage, and mitigate risks associated with traumatic brain injuries caused by concussive or sub-concussive hits. *Id.* ¶ 79.

Toward the end of his college career, Langston began struggling with severe anxiety and stress. He experienced drastic mood swings and anger issues and suffered from memory problems and depression. *Id.* ¶ 80. Langston was convinced that football had "messed up his brain," and he withdrew from social situations, became extremely paranoid, and had suicidal thoughts. *Id.* ¶¶ 2, 81.

Approximately four years later, on February 24, 2014, at age 26, Langston fatally shot himself in the chest. *Id.* ¶¶ 81–82. His brain was sent to Boston University's Chronic Traumatic Encephalopathy Center, and an examination conducted in June 2015 revealed that Langston had suffered from Stage II/IV Chronic Traumatic Encephalopathy ("CTE")—a progressive degenerative brain disease found in individuals with a history of repetitive brain trauma. *Id.* ¶¶ 4, 83.

## II. Defendants' Roles in Safeguarding the Health and Safety of Plaintiffs

The NCAA is the governing body of collegiate athletics. It oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including those that play football at PSU and other MIAA schools. *Id.* ¶ 15. To accommodate the wide spectrum of student-athletes at its member schools, the NCAA has three different divisions of intercollegiate competition. *Id.* ¶ 16.

The NCAA's predecessor, the Intercollegiate Athletic Association of the United States, was formed in the early 1900s specifically in order to make college football safer for student-athletes who were experiencing head injuries at an alarming rate. *Id.* ¶ 21. Similarly, the singular goal of

the NCAA was and is student-athlete safety. *Id.* To this end, the NCAA has stated it is "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life." *Id.*

Each NCAA division is composed of several conferences to facilitate regional league play. *Id.* ¶ 17. The MIAA is one such conference and currently consists of fourteen member institutions located in the middle region of the United States. *Id.* The MIAA promulgates rules, handbooks, and regulations for its member schools in order to regulate their athletic departments. *Id.* Each member institution, and each of the member institution's student-athletes, agree to abide by the rules and regulations issued by the NCAA and the MIAA. *Id.* As such, the NCAA and the MIAA oversee and regulate the PSU football program and owe a duty of care to safeguarding the well-being of its student-athletes. *Id.* ¶ 20.

The NCAA and the MIAA are governed by the NCAA Constitution, the primary principle of which is to ensure that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes." *Id.* ¶¶ 25, 31. To fulfill this overarching goal, the NCAA has promulgated and implemented certain regulations and requirements for its sports, including the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which provide detailed instructions on game and practice rules pertaining to player well-being and safety. *Id.* ¶ 26.

The NCAA also publishes a Sports Medicine Handbook ("Handbook") annually. *Id.* ¶ 27. The Handbook includes official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines. *Id.* These policies and guidelines recognize that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation." *Id.* As a

member conference in the NCAA, the MIAA is required to comply with, administer, and enforce all applicable NCAA rules, regulations, policies, and guidelines to protect the health and safety of PSU football players, such as Langston. *Id.* ¶ 31.

Furthermore, as compared to Langston and other collegiate football players, the NCAA and the MIAA were in a superior position to know of and mitigate the risks of concussions and traumatic brain injuries. *Id.* ¶ 42. And PSU football players rely on the NCAA and the MIAA to safeguard their health by preventing and treating head-related injuries. *Id.* ¶ 33.

## III.    Concussions and Concussion-related Symptoms

A concussion results from an impact that causes the brain to bounce around or twist in the skull. *Id.* ¶ 36. This trauma damages brain cells and triggers chemical changes in the brain. *Id.* During normal everyday activity, spinal fluid protects the brain from touching the skull. *Id.* ¶ 37. But impacts to the head and impacts to the body that whiplash the head, even relatively minor ones, can jolt the brain so that it presses through the spinal fluid to the skull. *Id.* ¶ 37.

Studies have shown that collegiate football players, during the course of a season, can receive more than 1,000 hits that deliver a force greater than 10G's.[3] *Id.* ¶ 38. And the majority of football-related hits to the head exceed 20G's. *Id.*

When a football player suffers a severe impact that affects the head, he or she may experience various symptoms, including: (1) seeing stars, dizziness, or lightheadedness; (2) memory loss; (3) nausea; (4) vomiting; (5) headaches; (6) blurred vision or light sensitivity; (7) slurred speech; (8) difficulty concentrating or decision-making; (9) difficulty with coordination or balance; (10) unexplained anxiety or irritability; and/or (11) excessive tiredness. *Id.* ¶ 40.

---

[3]    "G" is an abbreviation for "G-force," the force of gravity or acceleration on a body. *See* https://www.merriam-webster.com/dictionary/g-force.

Concussed persons may not recognize the signs of a concussion, and the symptoms may prevent them from realizing they have suffered a concussion. *Id.* ¶ 41.

The brain needs time to heal after suffering a concussion to prevent further injury. *Id.* ¶ 42. Doctors generally prohibit concussed patients from returning to normal activities for one to two weeks. *Id.* ¶ 42. Individuals who continue to experience concussion symptoms after a few weeks are diagnosed with post-concussion syndrome. *Id.* ¶ 44. The symptoms of post-concussion syndrome may last for months or may be permanent. *Id.*

## IV.     Long-term Effects of Concussions and Subconcussive Impacts

The complaint cites numerous studies that discuss the risks associated with brain trauma. *Id.* ¶¶ 46–61. For example, studies of brain injuries suffered by boxers date back to the 1920s. *Id.* ¶ 50. In a study published in 1928, Dr. Harrison Martland described the abnormalities found in nearly half of the boxers who had either been knocked out or who had suffered a considerable impact to the head. *Id.* ¶ 51. Other studies of boxers revealed that repetitive head injuries caused chronic neurological damage and a pattern of progressive decline in the form of dementia and motor function impairment. *Id.* ¶ 52.

The American Football Coaches Association published a report in the 1930s warning that players who suffered concussions should be removed from play. *Id.* ¶ 53. A 1952 article published in *The New England Journal of Medicine* recommended a three-strike rule for concussions in football that would prohibit players from playing football after three concussions. *Id.* In a 1969 study, Drs. J.R. Hughes and D.E. Hendrix used electroencephalograms ("EEGs") to examine the impact of severe hits on brain activity. *Id.* ¶ 54. Shortly thereafter, doctors identified a potentially fatal condition known as "Second Impact Syndrome," referring to a skull of an already-concussed brain that cannot accommodate another impact injury. *Id.*

More recently, Boston University's Chronic Traumatic Encephalopathy Center and the Brain Injury Research Institute conducted two well-regarded studies describing the long-term effects caused by concussions. *Id.* ¶ 46. These studies demonstrated that repeated concussions triggered progressive degeneration of brain tissue, including the build-up of an abnormal protein called "tau." *Id.* The studies also showed that repeated concussions resulted in an increased risk of depression, dementia, and suicide. *Id.*

In yet another example, Dr. Robert Cantu of Boston University's Chronic Traumatic Encephalopathy Center studied autopsies performed on the brains of former National Football League players, concluding that 96% of the samples showed signs of CTE. *Id.* ¶ 48. Dr. Cantu also reviewed analyses of brains of individuals who played football at any level and found that 79% exhibited indications of CTE. *Id.*

According to Langston, study after study published in established medical journals, including the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*, warned of the dangers arising from single and multiple concussions. *Id.* ¶ 55. These studies established that:

- even minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials, and reduced speed of information processing;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the brain tissue;

- immediate retrograde memory issues occur following concussions;

- repetitive head trauma has potential dangerous long-term effects on brain function, including causing encephalopathy;

- a football player who suffers a concussion requires significant rest before being subjected to further contact to avoid risk of further injury; and

- there is a relationship between neurologic pathology and length of the athlete's career in contact sports.

*Id.*

As a result of these studies, medical professionals began recommending changes to football and how concussion-related injuries should be handled. *Id.* ¶ 56. By 1991, Dr. Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained head injuries. *Id.* ¶ 57.

In fact, the NCAA began conducting its own concussion-related studies in 2003. *Id.* ¶ 58. One of these studies concluded that football players, who had previously sustained a concussion, were more likely to have future concussion-related injuries. *Id.* Another NCAA study found that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks." *Id.*

Along these same lines, in 2004, the National Athletic Trainers' Association issued a position statement recommending baseline cognitive and postural-stability testing, as well as return-to-play guidelines prohibiting athletes who exhibit symptoms of a suspected head injury from playing. *Id.* ¶ 59. That same year, neurological experts convened in Prague to improve the safety and health of athletes, who suffer concussive injuries in football and other contact sports, based on the latest research. *Id.* ¶ 60. These experts recommended that a player should never be returned to play while displaying any concussion-related symptoms, and coined the phrase, "when in doubt, sit them out." *Id.*

Langston claims that the NCAA and the MIAA were in a superior position when compared to himself and other PSU football players to know about these studies, *id.* ¶¶ 34, 98, and that the NCAA and the MIAA have known of the harmful effects of concussions and subconcussive impacts since 1933. *Id.* ¶ 64. According to Plaintiff, despite this knowledge, the NCAA and the MIAA continued to expand their football programs without instituting any meaningful methods of protecting student-athletes from the harmful effects of concussions, *id.* ¶ 61, and did not change their concussion management and return-to-play protocols until 2010. *Id.* ¶ 65.

In addition, Langston asserts that the 2010 concussion management plan was and remains deficient. *Id.* ¶ 71. For instance, a concussed student-athlete likely will be unable to make an informed decision about their ability to continue playing. *Id.* ¶ 71. And yet, the 2010 protocols allow a concussed student-athlete to return to play if he or she consents, without having received meaningful examination or treatment. *Id.*

The complaint here asserts state common law claims of negligence (Count 1), breach of express contract (Count 2), breach of implied contract (Count 3), breach of express contract as third-party beneficiaries (Count 4), and unjust enrichment (Count 5). The MIAA has moved to dismiss the negligence claim, the breach-of-implied-contract claim, and the unjust-enrichment claim. The NCAA has move to dismiss the breach-of-contract claims.

### Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

That said, when considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678).

## Analysis

### I.    Choice of Law

Because this case comes before the Court under its diversity jurisdiction, it must first address choice of law. *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 718 (7th Cir. 2018). In a multi-district litigation, such as this one, the transferee court must apply the choice-of-law rules of the transferor forum. *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010). Because this case was transferred from the District Court of Kansas, see Conditional Transfer Order 13 at 2, ECF No. 5, Kansas choice-of-law rules apply.[4]

"[I]f the law of Kansas [is] not in conflict with any of the other jurisdictions connected to the suit, then there [is] no injury in applying the law of Kansas." *Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 372 (Kan. 2002) (internal quotation marks omitted). Furthermore, where "a party fails to make 'a clear showing that another state's law should apply,' Kansas choice of law principles require a court to default to Kansas substantive law." *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 982 (10th Cir. 2014) (citing *In re K.M.H.*, 169 P.3d 1025, 1032 (Kan. 2007)).

---

[4]    By contrast, as to matters involving federal procedure, the transferee court is free to apply the law of its own circuit. *See In re McCormick & Co., Inc.*, 217 F. Supp.3d 124, 140 n.4 (D.D.C. 2016); *see also McMasters v. United States*, 260 F.3d 814, 819 (7th Cir. 2001).

The MIAA and the NCAA argue that Kansas law governs the statute of limitations applicable to Plaintiffs' claims, and Plaintiffs agree. *See* Pl.'s Resp. MIAA Mot. Dismiss at 5 n.1. Neither party asserts that a choice-of-law analysis would be outcome determinative for the purposes of Defendants' motion, and, thus, there is no harm in applying Kansas substantive law to the issues before the Court.

## II. Statute of Limitations Defenses

 Defendants first argue that the claims are precluded by the applicable Kansas statute of limitations. "Because complaints need not anticipate and attempt to plead around defenses, a motion to dismiss based on failure to comply with the statute of limitations should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014) (citations and internal quotation marks omitted); *see Weaver v. Frazee*, 547 P.2d 1005, 1014 (Kan. 1976). In other words, "[o]nly when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004); *see Weaver*, 547 P.2d at 1014.

### A. Negligence (Count 1)

Langston alleges that the MIAA and the NCAA were negligent by failing to prevent and treat the injuries to PSU football players caused by concussions and subconcussive hits. He further asserts that Defendants failed to warn the players of the dangers and symptoms of concussions and concussion-related brain injuries. The MIAA has moved to dismiss Plaintiff's negligence claim as being untimely.

In Kansas, the statute of limitations for negligence claims is two years. Kan. Stat. Ann. § 60-513(a)(4). Negligence claims "shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party." Kan. Stat. Ann. § 60-513(b). "[T]he term "substantial injury" in the statute does not require an injured party to have knowledge of the full extent of the injury to trigger the statute of limitations. Rather, it means the victim must have sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent." *LCL, LLC v. Falen*, 422 P.3d 1166, 1174 (Kan. 2018); *see Roe v. Diefendorf*, 689 P.2d 855, 859 (Kan. 1984); *see, e.g.*, *Bradley v. Val-Mejias*, 238 F. Supp. 2d 1242, 1252 (D. Kan. 2002), *aff'd*, 379 F.3d 892, 898–99 (10th Cir. 2004) ("The fact that Plaintiff did not have actual knowledge of the precise nature or the extent of his injury . . . does not negate the evidence that the fact of his injury was reasonably ascertainable to him . . . .").

"An injury is reasonably ascertainable when the plaintiff knew or could reasonably have been expected to know of the alleged negligence." *Knight v. Myers*, 748 P.2d 896, 901 (Kan. Ct. App. 1988). "[T]he term 'reasonably ascertainable' . . . suggests an objective standard based upon an examination of the surrounding circumstances." *P.W.P. v. L.S.*, 969 P.2d 896, 901–02 (Kan. 1998). "[T]here are two inquiries relevant to determining when the statute of limitations . . . beg[ins] to run: (1) . . . when were all the elements of the cause of action in place? and (2) [w]hen did the existence of that injury become reasonably ascertainable . . . ?" *LCL*, 422 P.3d at 1174.

Allegations in the complaint indicate that Langston became aware, in 2010, that the concussions he received while at PSU had caused substantial brain injury. For example, Langston alleges that, toward the end of his college career in 2010, he began to struggle with anxiety and

became consumed with debilitating stress over minor issues. Compl. ¶¶ 2, 80–81. Over the course of the next several months, Langston's behavior drastically deteriorated, and he experienced paranoia, suicidality, and memory loss. *Id.* What is more, Langston attributed his declining condition to the concussions he experienced as a football player. *Id.* ¶¶ 2, 18, 74. Although it was not confirmed that Langston had CTE until June 2015, *id.* ¶ 83, his lack of knowledge as to the precise nature or extent of his injury does not nullify the fact that his deteriorating brain condition was reasonably ascertainable by him in 2010. *See, e.g.*, *Bradley*, 238 F. Supp. 2d at 1252.

Be that as it may, Langston contends that the MIAA cannot rely upon the statute of limitation under the doctrine of equitable estoppel. And, indeed, "[e]quitable estoppel can be applied to bar a party from relying on the defense of the statute of limitations." *Rockers v. Kan. Turnpike Auth.*, 991 P.2d 889, 894 (Kan. 1999).

To do so, "[a] party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed." *Steckline Commc'ns, Inc. v. Journal Broad. Grp. of Kan., Inc.*, 388 P.3d 84, 91 (Kan. 2017) (internal quotation omitted). The party "must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts." *Id.* Proof of "fraud, bad faith, or the intent to deceive is not essential to create an estoppel." *Dunn v. Dunn*, 281 P.3d 540, 554 (Kan. 2012). All that is required is an element of deception. *Id.* And "[t]he type of conduct which is sufficient to give rise to an estoppel generally raises a question of fact . . . ." *Maple Trade Fin., Inc. v. Lansing Trade Grp., LLC*, No. 10-2066-JTM, 2011 WL 1060961, at *17 (D. Kan. Mar. 21, 2011).

Here, Langston alleges that Defendants concealed facts from PSU football players and their families regarding Defendants' failure to protect players from risks of developing CTE or other

degenerative brain diseases, even when Defendants knew better, and remained silent when they had a duty to speak about the danger. *See* Compl. ¶ 95. Langston further asserts that players and their families reasonably relied on the MIAA's guidance, expertise, and instruction to understand the risks associated with concussive and sub-concussive hits in football. *Id.* ¶¶ 97–98. If these allegations prove true, Langston may have "rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts." *Steckline*, 388 P.3d at 91 (internal quotation marks omitted). Accordingly, whether the nature and circumstances surrounding this alleged conduct give rise to estoppel is a question of fact, and Langston's claims cannot be dismissed at the pleading stage.

Viewing all of the allegations in the light most favorable to Plaintiff, the Court concludes that Langston has not pleaded himself out of court as to his negligence claim. The motion to dismiss Count 1 is denied.

### B. Breach of Contract (Counts 2, 3, and 4)

Count 2 alleges that the NCAA breached its contracts with Langston and other PSU football players by failing to protect them from sustaining latent, concussion-related brain injuries.[5] Count 3 claims that the NCAA and the MIAA breached implied contracts with them. And Count 4 alleges in the alternative that Langston and other PSU football players are third-party beneficiaries to the contract between the NCAA and the MIAA, and that the NCAA breached certain obligations to them. For their part, the NCAA and the MIAA again argue that the statutes of limitations bar these claims.

---

[5] Although the express-breach-of-contract claim (Count 2) does assert that "Defendants" are liable, Compl. ¶ 114, only the NCAA is alleged to have breached an agreement with Langston in that count. *Id.* ¶¶ 106–13.

The statute of limitations for claims asserting a breach of a written contract is five years. Kan. Stat. Ann. § 60–511. The statute of limitations for claims alleging a breach of an implied contract is three years. Kan. Stat. Ann. § 60–512.

As Langston sees it, his contract claims are timely based upon on the general rule in Kansas that "a cause of action accrues, so as to start the running of the statute of limitations, as soon as the right to maintain a legal action arises." *Pancake House, Inc. v. Redmond ex rel. Redmond*, 716 P.2d 575, 579 (Kan. 1986). In his view, because a contract claim requires the existence of a contract, consideration, performance, breach, and damages, Langston could not have brought his breach of contract claim until he suffered actionable damages. *See Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (listing elements).

While Langston correctly states the general rule of claim accrual, the Supreme Court of Kansas has held that "[a] cause of action for breach of contract accrues when a contract is breached by the failure to do the thing agreed to, irrespective of any knowledge on the part of the plaintiff or of any actual injury it causes." *Pizel v. Zuspann*, 795 P.2d 42, 54 (Kan. 1990), *modified on other grounds on denial of rehearing*, 803 P.2d 205 (Kan. 1990). The Supreme Court reasoned that "[t]he Kansas Legislature has not provided a discovery exception . . . , and Kansas courts cannot engraft an exception which the legislature . . . has not included in the statute." *Law v. Law Co. Bldg. Assocs.*, 289 P.3d 1066, 1081 (Kan. 2012) (discussing § 60–511); *see Four Seasons Apartments, Ltd. v. AAA Glass Serv., Inc.*, 152 P.3d 101, 105 (Kan. Ct. App. 2007) (discussing § 60–512).

Here, Langston played football for PSU from 2007 to 2010, and the complaint can be reasonably construed to allege that Defendants breached their contracts with him by failing to prevent and protect football players from degenerative concussion-related brain injuries during

that time.  *See* Compl. ¶¶ 73, 110, 119, 127.  Viewing these allegations in the light most favorable

to Langston, he has plausibly alleged that such breaches continued into December 31, 2010, at a

minimum.  Accordingly, he was required to bring his breach-of-implied-contract claim against the

MIAA and the NCAA by December 31, 2013, and his breach-of-express-contract claim against the

NCAA by December 31, 2015.

Complicating matters, the NCAA agreed in the medical monitoring settlement agreement

in *In re National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*,

Master Docket No. 13 C 9116, that the limitations period for breach-of-contract claims brought by

any Settlement Class Member, of which Langston is one, would be deemed tolled as of March 11,

2013—the date that Adrian Arrington and others filed their breach of contract claims in *Arrington

v. NCAA*, Docket No. 11 C 6356.  *See id.*, 2d Am. Settlement Agreement ¶ XXI.S, ECF No. 266-2

("The NCAA agrees that all statutes of limitations on claims asserted in *Arrington* have been tolled

since those claims were first asserted and will remain tolled until the Court has ruled on the Motion

for Final Approval filed by Class Counsel of this Settlement, at which point the tolling period on

such claims will end except as otherwise specified in this Settlement Agreement."); *see also id.*,

8/19/19 Am. Final Order & J., ECF No. 558.  As a result, the statutes of limitations for contract

claims against the NCAA did not expire before Langston brought this lawsuit on June 2, 2017.

*See* Compl., ECF No. 1.  The NCAA's motion to dismiss Counts 2 and 3 is denied.

As for the MIAA, the settlement agreement in *In re National Collegiate Athletic

Association Student-Athlete Concussion Injury Litigation* did not provide for the tolling of any

claims against the MIAA.  *See* 2d Am. Settlement Agreement.  The statute of limitations therefore

expired on December 31, 2013.  Plaintiffs filed their complaint on June 2, 2017, missing the cut-

off by over three years.  Nevertheless, for the reason discussed above, the doctrine of equitable

estoppel bars the MIAA from relying on the statute of limitations at the pleading stage. *See Badwey Oil, Inc. v. ConocoPhillips Petroleum Co.*, 352 F. App'x 276, 280 (10th Cir. 2009 (applying equitable tolling to contract claim under Kansas law). Accordingly, the Court denies the MIAA's motion to dismiss Count 3.

### C. Unjust Enrichment (Count 5)

In Kansas, the three-year statute of limitations for breaching implied contracts also applies to unjust enrichment claims. *See Estate of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 715 (Kan. 2009) (citing Kan. Stat. Ann. § 60–512). To prove unjust enrichment, a plaintiff must show that: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated and has knowledge of the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make the retention unjust." *Univ. of Kan. Hosp. Auth. v. Bd. of Comm'rs of Cty. of Wabaunsee*, 327 P.3d 430, 441 (Kan. 2014).

Here, Langston alleges that, while he played football for PSU from 2007 to 2010, the MIAA knowingly benefited from his play and the play of others by receiving revenues from ticket sales as well as the sale of broadcasting and merchandising rights. *Id.* ¶¶ 131–32. As such, he seeks restitution or disgorgement in the amount of all of the monies MIAA unjustly received during the time that it failed to prevent and protect Langston and his teammates from concussions. *Id.* ¶ 133.

In response, the MIAA contends that Langston's unjust enrichment claim also is barred by the statute of limitations. Claims for unjust enrichment accrue when all of these elements are present. *Orr v. Husch Blackwell LLP*, No. 16-2694-CM, 2017 WL 3873731, at *6 (D. Kan. Sept. 5, 2017), *aff'd*, 718 F. App'x 759, 761 (10th Cir. 2018). Generally speaking, an unjust enrichment cause of action "accrues when the enrichment becomes unjust." *Estate of Draper*, 205 P.3d at 715.

Langston argues that his unjust enrichment claim did not accrue until June 2015, when the examination of Langston's brain revealed he had CTE. According to Langston, it was not until that point that he realized the MIAA had benefited unjustly from his injuries. In *Northern Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 630 (10th Cir. 2008), the applicability of the discovery rule to unjust enrichment claims under Kansas law came before the Tenth Circuit. *Id.* While the court declined to rule on the issue because it was unnecessary for its decision, it did note that no court had applied the discovery rule in the context of unjust enrichment claims. That said, two Kansas district courts have refused to apply the discovery rule to unjust enrichment claims under Kansas law.

In *Freebird, Inc. v. Merit Energy Co.*, the district court noted that the Kansas statute recognizing the discovery rule applies it to only seven types of actions—unjust enrichment not being one of them. *See* 883 F. Supp. 2d 1026, 1039 (D. Kan. 2012) (citing Kan. Stat. Ann. § 60–513(a)). The court stated, "Without any authority to support applying the discovery rule to plaintiff's unjust enrichment claim, the Court declines to do so—particularly given the reluctance of Kansas courts to soften statutes of limitations by interpreting them to include provisions not expressly contained in the statute." *Id.* (citing *McCoy v. Wesley Hosp. & Nurse Training Sch.*, 362 P.2d 841, 847 (Kan. 1961), and *Atchison, T. & S.F. Ry. Co. v. Atchison Grain Co.*, 75 P. 1051, 1053 (Kan. 1904)).

In *Doll v. Chi. Title Ins. Co.*, the district court rejected the discovery rule for a different reason. 517 F. Supp. 2d 1273, 1282 (D. Kan. 2007). There, the court noted that Kansas courts universally applied the statute of limitations for implied contracts to unjust enrichment claims. *See* Kan. Stat. Ann. § 60–512. It further observed that the implied-contract statute of limitations does

18

not mention the discovery rule and, thus, refused to apply the doctrine to unjust enrichment claims. *Id.*

Finding the reasoning in *Freebird* and *Doll* persuasive, the Court concludes that Kansas law would not recognize the discovery rule in the context of unjust enrichment claims. That said, it is not at all clear whether the MIAA benefited from Langston's contributions to the FCU football program after December 2010, and nothing in the complaint forecloses it. Furthermore, if Langston's allegations are correct, the doctrine of equitable estoppel would bar the MIAA from relying on the statute of limitations as to this claim. Accordingly, MIAA's motion to dismiss Count 5 is denied.

## III. Failure to State Contract Claims

Next, the MIAA and the NCAA argue that Langston has failed to state a claim for breach of contract. "The elements of a breach of contract claim are: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte*, 298 P.3d at 1098.

### A. Breach of Express Contract (Count 2)

The NCAA argues that Plaintiffs have failed to state a breach of a written contract claim in a plausible manner. Of course, the Federal Rules of Civil Procedure do not require a plaintiff to attach a copy of the contract to the complaint. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). Rather, a plaintiff is merely required to plead facts sufficient to state a plausible breach-of-contract claim. *See, e.g.*, *Hedeen Int'l, LLC v. OzWest, Inc.*, No. 14-C-304, 2014 WL 5682507, at *1 (E.D. Wis. Nov. 4, 2014) (holding that alleging "both that a contract

existed and that the Defendants violated that contract by not paying royalties [was] . . . enough to at least survive a motion to dismiss based on Fed. R. Civ. P. 8.").

For its part, the NCAA relies on *Boedicker v. Rushmore Loan Management Services, LLC*, No. 2:16-CV-02798-JTM, 2017 WL 1408158, at *4 (D. Kan. Apr. 20, 2017), *Washington v. Washington*, 605 F. App'x 716, 718 (10th Cir. 2015), and *Weil & Associates v. Urban Renewal Agency of Wichita*, 479 P.2d 875, 884 (Kan. 1971). All three cases are readily distinguishable.

In *Boedicker*, the plaintiffs sued their mortgage loan servicer, alleging only that the defendant had breached a "binding contractual relationship." The district court granted the defendant's motion to dismiss because the plaintiffs had failed to allege any facts showing the existence of a contract or the nature of the promises the defendant had made. 2017 WL 1408158, at *4. In *Washington*, the plaintiff sued his ex-wife and a Jane Doe for breach of contract, and the Tenth Circuit affirmed the district court's dismissal of the claim on the grounds that the complaint did not describe how either defendant had breached a contract. 605 F. App'x at 717–18. In *Weil*, the plaintiff sued the defendant for breach of a land-sale contract and attached a series of letters to the complaint. The Kansas Supreme Court affirmed the dismissal of the claim, because the letters showed that no agreement had been reached about the amount of land to be conveyed. 479 P.2d at 884.

By contrast, Langston has provided specific allegations describing how he and other PSU football players entered into contracts with the NCAA. For example, before playing football at PSU, Langston was required by the NCAA to sign a form agreement. Compl. ¶ 107. According to Langston, by signing the form, he agreed that he had read the NCAA regulations and manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and promised that he would comply with the NCAA bylaws. *Id.* In exchange, the NCAA

agreed to enforce those strictures by conducting intercollegiate athletics in a manner designed to protect the physical and educational well-being of student athletes and to require member institutions to protect the health and safety of each student athlete. *Id.* ¶ 108. Langston further contends that the NCAA's intent to enter into such agreements can be further gleaned from its statements in its various manuals, handbooks, constitution, and bylaws. *Id.* ¶¶ 23–30.

Furthermore, Langston asserts that he fulfilled his contractual obligations by playing football for PSU and by abiding by the NCAA regulations. *Id.* ¶ 109. On the other hand, as alleged in the complaint, the NCAA breached its contracts with Langston and his fellow players by failing to conduct football in a manner designed to protect their physical and educational well-being and by failing to require PSU to protect their health and safety. *Id.* ¶¶ 35–72, 110.

Viewing these facts in the light most favorable to Plaintiff, the Court concludes that Langston has sufficiently pleaded a breach of express contract claim against the NCAA. The NCAA's motion to dismiss this claim is denied.

## B. Breach of Implied Contract (Count 3)[6]

Langston also brings a breach-of-implied-contract claim against the NCAA and the MIAA based upon the NCAA Constitution, bylaws, as well as its rules and regulations. "The existence of an implied contract depends on the intent of the parties, divined from the totality of the

---

[6] "Under Kansas law, [a plaintiff] cannot recover on claims of both implied and express contract when the same conduct constitutes the alleged breach." *RLI Ins. Co. v. Russell*, No. 14-2479-EFM-JPO, 2015 WL 9455569, at *5 (D. Kan. Dec. 23, 2015). Nonetheless, "the Federal Rules of Civil Procedure allow [a plaintiff] to allege breaches of express and implied contract in the alternative." *Id.*; *see Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 366 (7th Cir. 2017) ("The Federal Rules of Civil Procedure—which allow alternative and even inconsistent pleadings and take a permissive view of amendments—are drafted flexibly so parties may tailor their theories as they conduct discovery and learn more about the case.").

circumstances." *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995) (applying Kansas law). Determining the "intent of the contracting parties is normally a question of fact for the jury and . . . the determination of whether there is an implied contract . . . requires a factual inquiry." *Morriss v. Coleman Co., Inc.*, 738 P.2d 841, 848 (Kan. 1987). Courts consider several factors to determine whether the parties mutually intended to enter into a contract, including: (1) "the understanding and intent of the parties, which are ascertainable from written and oral negotiations"; (2) "the conduct of the parties"; (3) "the usages of the business"; (4) "the situation and objective of the parties giving rise to the relationship"; (5) "the nature of the [relationship]"; and (6) any other circumstances surrounding the . . . relationship which would tend to make clear the intention of the parties at the time the . . . relationship commenced." *Litton v. Maverick Paper Co.*, 354 F. Supp. 2d 1209, 1217 (D. Kan. 2005).

Defendants are correct that a written policy alone cannot create an implied contract. Nonetheless, Kansas law is replete with cases in which courts have held that an entity's express policy may be considered as one of many factors in determining whether an implied contract exists. *See, e.g.*, *Anglemyer*, 58 F.3d at 538 ("[Plaintiff] has presented evidence in addition to the contents of the hospital's personnel handbook to support her implied contract theory."); *Litton*, 354 F. Supp. 2d at 1217 (denying motion to dismiss where the plaintiff alleged that the defendant created an implied contract through its written policies, information, and custom, despite that a manual contained a disclaimer that it did not create a contract); *Wilkinson v. Shoney's, Inc.*, 4 P.3d 1149, 1164 (Kan. 2000) ("There were many specific provisions in the various . . . materials upon which the jury could rely to find the existence of an implied . . . agreement.").

Here, Langston alleges that the parties' intent to contract can be garnered, not only from their constitutions, bylaws, and rules and regulations, but also from the parties' conduct. At the

very least, the complaint claims that the NCAA and the MIAA have conducted themselves in a manner that demonstrates their intent to protect student-athletes from head injuries, including by controlling how college football is played and adhering to safety guidelines regarding head injuries. *Id.* ¶¶ 21, 26–28. Langston asserts he agreed to play under the NCAA's and the MIAA's control in accordance with their guidelines in exchange for their providing him with a safe environment in which to play football. *Id.* ¶¶ 117, 119. In this particular way, the complaint sufficiently alleges that the parties' conduct gave rise to an implied contract, and Defendants' motions to dismiss the implied-contract claim are denied.

### C.     Breach-of-Contract Claim as Third-Party Beneficiaries (Count 4)

Lastly, the NCAA argues that Langston has failed to state a plausible breach-of-contract claim based on the theory that he was a third-party beneficiary of the contract between the NCAA and PSU. "Generally, where a person makes a promise to another for the benefit of a third person, that third person may maintain an action to enforce the contract even though he had no knowledge of the contract when it was made and paid no part of the consideration." *Fasse v. Lower Heating & Air Conditioning, Inc.*, 736 P.2d 930, 932 (Kan. 1987). On the other hand, "[c]ontracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract." *Gov't Emps. Ins. Co. v. Andujar*, 773 F. Supp. 282, 288 (D. Kan. 1991) (internal quotation marks and citations omitted).

The NCAA argues that dismissal is appropriate because Langston has not cited to a particular contract or a contractual provision upon which to base his claim. This precise issue came up in *Flores v. Nickelson*, No. 16-3022-JAR-JPO, 2019 WL 1228234, at *3 (D. Kan. Mar. 15, 2019). There, a detainee sued the jail's medical-care provider for breach of contract, claiming that he was a third-party beneficiary of the provider's medical contract with the Department of

Corrections. *Id.* The provider filed a motion to dismiss the claim, pointing out that the plaintiff had failed to cite a specific contract provision. Applying Kansas law, the *Flores* court denied the motion to dismiss, holding that the detainee had sufficiently stated a third-party beneficiary claim by alleging that the contract required the provider to provide comprehensive healthcare services to detainees and that the sole beneficiaries of this obligation were detainees, like the plaintiff. *Id.*

Similarly, here, Langston has alleged that the NCAA and PSU entered into a contract obliging the NCAA and PSU to conduct athletic programs in a manner designed to protect the health of PSU's student-athletes. Taking these allegations to be true and making all reasonable inferences in Langston's favor (as the Court must do at this stage), the complaint sufficiently alleges that these obligations were intended solely for the benefit of student-athletes, like Langston. Accordingly, Defendants' motion to dismiss Plaintiff's third-party beneficiary claim is denied.

## Conclusion

For the reasons provided above, the MIAA's motions to dismiss and the NCAA's motion to dismiss are denied.

**IT IS SO ORDERED.**                    **ENTERED  3/25/20**

_____
**John Z. Lee**
**United States District Judge**